## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CLAYTON PLUMTREE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 22-cv-6635 |
| | ) |
| CITY OF NAPERVILLE, JASON ARRES, | ) Hon. Judge |
| police chief, in his official and ind. capacities, | ) |
| NAPERVILLE'S BOARD OF FIRE & POLICE | ) **JURY DEMANDED** |
| COMMISSIONERS, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES Plaintiff, CLAYTON PLUMTREE, by and through his attorney, GIANNA SCATCHELL of DISPARTI LAW GROUP, P.A., and complaining of Defendants, CITY OF NAPERVILLE ("City"), as indemnitor, Chief of Police, JASON ARRES ("Arres"), in his official and individual capacities, and NAPERVILLE'S BOARD OF FIRE AND POLICE COMMISSIONERS ("Board") (collectively, the "Defendants") and alleges upon personal knowledge regarding himself and his own acts, and on belief, regarding all other matters:

## PRELIMINARY STATEMENT

1. The City of Naperville allows its Department to maintain an improper traffic stop quota where every patrol officer must make an average of two traffic stops per shift. Plumtree was fired twice based on purported misconduct arising out of this unlawful ticket quota system.

2. Plaintiff seeks all remedies including reinstatement, lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION, VENUE, & PARTIES

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) and (4) and 28 U.S.C. § 1331 to secure protection of and to redress the deprivation of rights secured by 42 U.S.C. § 1983. Declaratory relief is sought under 28 U.S.C. §§ 2201 and 2202.

4. Jurisdiction is proper over the state law count(s) pursuant to 28 U.S.C. § 1367 because the state law count is so related to the other claims in this action to form part of the same case or controversy.

5. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the events giving rise to the claims took place in the Northern District of Illinois, and because Defendants maintain places of operation within this judicial district.

6. Plaintiff, Clayton Plumtree, ("Plumtree" or "Plaintiff") is a legal adult and a resident of Illinois. Plumtree was formerly employed as a police officer in the City of Naperville.

7. Defendant, Jason Arres, is Naperville's Chief of Police and is named in his official and individual capacities.

8. At all times relevant, Defendant Arres promulgated rules, regulations, policies, and procedures as Chief of Police for the training, supervision, advisement, and discipline (up to three days) of the Naperville Police Department regarding: (1) conduct; (2) personnel files and personally identifiable information; (3) compensatory time and sick leave; (4) hiring and recruiting; (5) restructuring and transfers; and (6) referrals to the employee assistance program.

9. Arres exercised his inherent and delegated authority as a final policymaker to influence the Board of Fire and Police Commissioners' decision to terminate Plaintiff's employment with the City Police Department to such an extent that Defendant Arres was the effective cause of Plaintiff's termination.

10. Defendant, Naperville's Board of Fire and Police Commissioners (hereinafter the "Board") is a statutorily created administrative agency under 65 ILCS 5/10-2.1-1 *et seq*.

11. At all times relevant, Naperville's Board of Fire and Police Commissioners is vested with the sole authority to appoint, hire, and discipline of more than three days to police officers of the City of Naperville Police Department.

12. Defendant, City of Naperville ("City" or "Naperville") is a municipality incorporated under the State of Illinois laws. It funds both the Naperville Police Department and Naperville's Board of Police and Fire Commissioners. The City has indemnification obligations for wrongful acts committed by its officials, such as Defendants Arres and the members of the Board of Fire and Police Commissioners. *See* 745 ILCS § 10/1-202 and § 9-102. It is sued in its capacity as indemnitor only.

### Naperville's Board of Fire and Police Commissioners

13. Pursuant to Naperville's Ordinance § 2-13-2, the Board of Fire and Police Commissioners ("Board") shall consist of five (5) members and shall be appointed by the City Council and shall serve at the discretion of the Council.

14. The Board shall have charge of:

   a) all appointments to and promotions and demotions within the Fire and Police Departments, except the Fire and Police Chiefs, the District and Assistant Fire Chiefs and Deputy Chiefs of Police, and conduct and hold all entrance and promotional examinations in the manner required by law, and shall perform such other duties as specified by statute except as may be provided by the City Council and

   b) The Board shall adopt, enforce, administer, and amend rules and regulations which are consistent with governing state and federal law, and which are not in conflict with this

Code, except as may be approved by the City Council, acting within its home rule authority. § 2-13-3: - POWERS AND DUTIES.

15. "All appointments to and promotions within the Police Department, except that of the Chief and the management ranks of Deputy Chief of Police and Police Commander, shall be made by the Board as approved by statute, and no police officer, except the Chief of Police and the management ranks of Deputy Chief of Police and Police Commander, shall be discharged from the Department except after a hearing before the Board of Fire and Police Commissioners as provided by law." Naperville Municipal Code §1-8A-1: - APPOINTMENTS AND DISCHARGES; § 2-13-3: - POWERS AND DUTIES.

16. The Board's rules outline what process police officers are due for disciplinary or termination proceedings:

    a. "In no case shall a probationary police officer be discharged until after the Board provides the Police Chief with a written decision upholding the Police Chief's termination recommendation."

    b. "The Board shall consider the written recommendation of the Police Chief to appoint to full-time, non-probationary status or terminate, and shall act upon that recommendation by either appointment or termination."

### The Career of Clayton Plumtree

17. Until his unlawful termination, Plumtree proudly served as a police officer for the last 14 ½ years.

18. Plumtree began working as a probationary police officer for the Defendant City on April 19, 2021 as a lateral hire from Oakbrook Terrace.

19. Plumtree became a police officer to serve communities like Naperville and do it in an unbiased manner that respects the rights of the citizens he serves.

20. Plumtree always prided himself in working as a police officer with pride, honesty, integrity, and professionalism.

21. During Plumtree's police career, he has earned an excellent reputation among his colleagues and has received awards, commendations, and complimentary letters from residents he served.

22. All of Plumtree's evaluations stated that he met or exceeded the Department's expectations and reflected his continual progress in correcting behavior highlighted as an area requiring improvement.

23. Plaintiff was consistently commended for strong performance in several areas, including, but not limited to, being an experienced officer, exhibiting a high level of integrity, and dedication and service to the community.

24. Plumtree served without incident until the allegations leading to the filing of this lawsuit.

**<u>Quota-based Policing is Illegal, and Leads to Unconstitutional Police Practices</u>**

25. The use of quota-based policing strategies, which require police officers to make a certain number of stops per day, regardless of the amount of criminal activity occurring that day, has been recognized to cause illegal seizures and racial profiling.

26. Under Illinois law, it is unlawful to require a police officer to issue a predetermined or specified number of traffic citations, and no police officer's performance evaluation should be predicated on the number of issued citations. See 65 ILCS § 5/11-1-12.

27. The Illinois Attorney General further stated that:

[T]he use of quotas in law enforcement--whether described as goals, targets, performance standards, or activity metrics is deeply problematic" and "[q]uotas in law enforcement have also generated significant litigation around the country including the Floyd stop-and-frisk case in New York City and labor disputes in departments nationwide. *See Exhibit 1.*

**28.** In particular, the Illinois Attorney General outlined the myriad of problems that police quotas can cause for police officers and the general public including:

    **a.** Forcing officers to be concerned about obtaining a reward or avoiding a penalty, which may cause some officers to misreport their activities to comply with numeric requirements.

    **b.** Wrongly encouraging supervisors to acquiesce or tolerate such misreporting, fraud, and other misconduct to meet the department's quota.

    **c.** Distorting officer behavior away from important, but more time-intensive efforts to carry out problem-solving and engage in community events and other important public safety activities. *Id.*

**29.** The Illinois Attorney General further opined that a quota system for traffic stops is rife with significant downsides, especially without additional training, data, and accountability systems even if it is disguised as a "positive community interactions." *Id.*

**30.** The Illinois Attorney General's Office has issued requests to other police departments, including the Chicago Police Department ("CPD"), to "suspend or pause any effort to record a certain number of 'Positive Community Interactions' and that CPD "should immediately communicate that the PCI system will not to be used as a numerical performance measure for officers (even informally) at this time." *Id.*

**Naperville Police Department's Illegal Quota System**

**31.** At all times relevant, since at least 2019, the Naperville Police Department ("Department") has adhered to a traffic stop quota system, "Traffic Stop Expectation Policy," whereby all officers are required to conduct at least two traffic stops per shift. *See Department Memorandum dated 12/20/21.*

# NAPERVILLE POLICE DEPARTMENT
# MEMORANDUM

**DATE:**      12/20/2021

**TO:**          All Patrol Personnel

**FROM:**     Patrol Deputy Chief and Commanders

**SUBJECT:**   Traffic Stop Expectations

---

## Purpose
The purpose of this memorandum is to clarify expectations regarding the goal and expectations for patrol and traffic officers regarding traffic stops.

## Expectations
Since 2019, the Patrol Division has implemented an expectation that each officer makes an average of at least two traffic stops per working day. The purpose of this practice as mentioned in the Patrol Watch Guidelines is to: Increase proactive traffic enforcement and community engagement, as they are critical components to maintaining a safe city. This enforcement should be data driven and aimed at solving problems within our community i.e. high crash and crime areas, crash causing behaviors (i.e. speed, cell phone use), etc. This helps with identifying suspicious activity, accident reduction, crime suppression, DUI enforcement and identifying potential suspects of crimes.

The following is meant to clarify these expectations going forward and eliminate any confusion:
- Patrol Officers are expected to average at least two traffic stops per working day.
- Officers progress regarding any and all goals (which includes this traffic stop expectations) will be monitored by their respective sergeant and documented in Guardian Tracking under Annual Goals and Objectives each quarter. **The first evaluation quarter for this year will be from January 1 through March 31, 2022. The second evaluation quarter after that will be from April 1 through June 30, 2022. The third evaluation quarter will be from July 1 through September 30, 2022. The last quarter will be from October 1 through December 31, 2022 and will be covered as part of the annual evaluation.**
- Sergeants will be asked to account for time off for each individual officer such as vacation, sick, comp, training, shadow days with other units, etc., to effectively measure the hours worked and ensure its accuracy.
- Other factors and considerations can be made for officers who carry a significant case load, continually work towards completing those investigations, other special projects or problem-solving initiatives.
- Officers who do not meet expectations and cannot demonstrate they were consistently working on significant events, investigations, projects, or duties will be held accountable.

  - Sergeants will be steadily meeting with officers to assist all officers in achieving these goals, so that there are no surprises if expectations are not met. This is in addition to the meeting that takes place at the three-month evaluation period.

If you have any questions or concerns, do not hesitate to discuss this with one of the Watch Commanders or myself.

32. Defendant City unlawfully monitors police officer's compliance with its illegal quota system stating that:

Officers [sic] progress regarding any and all goals (which includes this traffic stop expectations) will be monitored by their respective sergeant and documented in Guardian Tracking under Annual Goals and Objectives each quarter. *See 12/20/2021 Memorandum*

33. Defendants punish police officers who fail to meet their expected quotas and who "cannot demonstrate they were consistently working on significant events, investigations, projects, or duties" by vaguely asserting that the underperforming officer "will be held accountable." *Id.*

34. The Department's traffic stop quota is "data-driven" and serves as the primary basis for evaluating police officers' performance. *Id.*

35. Arres demanded certain numbers relating to traffic stops, regardless of the criminal or traffic activity, justifying police intervention. In other words, regardless of the criminal activity occurring that day, the Naperville police officers are required to make the same number of stops.

36. Basing officer performance on statistic-based policing is illegal in Illinois.

37. On belief, the Department's "Expectation Policy" has led to five (5) Office of Professional Standards' investigations for the Naperville Police Department and is being reviewed for possible revisions in 2023.

38. The Department supervisors verbally expressed their concerns with the "Expectation Policy" as the supervisors were accountable for meeting monthly quotas for their shift.

### **Defendants' Illegal and Unconstitutional Policing Practices**

39. The Department's traffic stop quota has caused considerable discontent within the patrol division.

40. For example, in April 2022, Plumtree was in roll call, and a heated discussion broke out amongst the patrol officers regarding the "Traffic Expectation Policy."

41. Plumtree's supervisor, Sergeant Heun, stated: "Plumtree makes a lot of traffic stops. If you need some numbers, just take some of his."

42. Other officers were present in roll call that day, including Officer Razionale.

43. Officer Razionale was one of the officers who was not meeting the traffic stop quota.

44. Both Plumtree and Razionale understood Heun's statement to mean that if Razionale needed more traffic stops to meet his quota, he could attach himself to some of Plumtree's traffic stops.

45. Subsequent to Sgt. Heun's statement, Plumtree continued to meet his traffic stop quota, but Officer Razionale began changing some of Plumtree's traffic stops so that he was the primary officer and Plumtree was listed as the secondary (backup) officer.

46. Razionale also began changing some of Sgt. Heun's traffic stops to list himself as the primary and Sergeant Heun as the backup officer.

47. On or about August 16, 2022, Plumtree notified Sergeant Heun that Razionale was taking credit for Plumtree's stops.

48. Later that evening, Sergeant Heun notified his supervisor, Commander Deuchler that Razionale was taking credit for some of Plumtree's stops.

49. Commander Deuchler responded to Sergeant Heun that it was a "gray area," but it said that the practice would be permitted "so long as everyone met their traffic stop quotas."

50. On belief, the only reason that Razionale added himself to some of Plumtree's and Heun's traffic stops was to meet the Department's traffic stop quota.

51. On belief, the Defendant City's CAD system allowed Officer Razionale to change himself to the primary officer on some of Plumtree's traffic stops.

52. Razionale never added himself to any of Plumtree's traffic stops that resulted in an arrest or generated a police report number.

53. Plumtree never benefited from allowing Razionale to be listed on his stops other than by being a "team player" in helping another officer meet the Department's illegal quota goals.

54. Plumtree acted in good faith, and with the understanding that practice was approved, if not encouraged, by his immediate supervisor.

55. On or about August 25, 2022, Commander Deuchler directed Sergeant Heun to order Razionale to stop taking credit for Plumtree's stops because some officers matched the body camera footage with traffic stops.

56. Commander Deuchler further related that if Plumtree and Razionale did not stop sharing stops they could get in trouble.

57. Sergeant Heun notified Razionale that Commander Deuchler had previously authorized him taking credit for Plumtree's traffic stops, but that Razionale now needed to stop taking credit for Plumtree's stops.

58. Sergeant Heun never had a similar conversation with Plumtree.

59. On September 2, 2022, Plumtree was ordered to the police station before his shift began.

60. When Plumtree arrived at the Department's station, investigator Michaus Williams notified Plumtree that he was under investigation for Rationale's changed traffic stops and would be placed on paid administrative leave pending the outcome of the investigation.

### Plumtree's First Termination

61. Only the Board shall render decisions to appoint or terminate police officers.

62. Despite this policy, on October 14, 2022, Defendant Arres terminated Plumtree stating that all three charges for conduct and behavior, department reports, and truthfulness had been sustained against Plumtree.

63. Arres' termination decision accused Plumtree of violating the following Department's general orders:

   a. Officers shall be truthful and complete, and no employee shall knowingly enter, or cause to be entered any inaccurate, false, or improper information.

   b. Attention to Duty – Truthfulness - Employees shall not make false or untrue statements during the course of their duties or as may reflect on the Department

64. After Arres' termination letter, Arres circulated an email to the entire police department informing the entire department that Plumtree was fired.

65. Arres also attended various roll call meetings and informed employees that Plumtree was fired due to integrity issues.

66. On belief, Arres also informed the Dupage County State's Attorney's Office and the Will County State's Attorney's Office that Plumtree had committed a "Brady violation" and should be placed on the so-called Brady list meaning that Plumtree would be considered an incredible witness.

67. Arres also prematurely filed a report against Plumtree with the Illinois Law Enforcement Training and Standards Board to prevent him from ever being hired as a police officer without waiting for the Board's termination decision to be "final" and his appeal rights to be exhausted. 50 ILCS 705/6.2.

**The Meaning of Police Reports, Events, and Warnings**

68. Officers and Detectives of the Naperville Police Department write and submit over 100,000 reports a year.

69. Every report also lists the name and badge number of the Department supervisor that reviews such reports for content, completeness, and accuracy.

70. All reports are written for the purpose of competently and accurately documenting the facts of a specific incident that led to an arrest or significant event.

71. Certain police interactions are not considered "Reports" as defined by the Department's policies including:

    a. "Events," which consist of routine public interactions that are so basic and minimal in content or significance that the happenings therein do not require the incident to be documented in a report. Events receive an event, not a report number.

    b. "Traffic stops" mean that an individual was detained, but it does not mean that they were formally issued a traffic citation or placed under arrest.

72. Most traffic stops are classified as "events."

73. Traffic stops are classified as reports only when a crime has been committed, an arrest is effectuated, or in an officer's discretion.

74. Plumtree never submitted a false report because the stops did occur, and the warnings, if any, were issued

### Arres Rescinds Plumtree's Termination

75. On October 19, 2022, Arres rescinded Plumtree's termination since he had no authority to unilaterally fire Plumtree and further stated that he was extending Plumtree's probationary period for 30 days for "disciplinary purposes."

### Plumtree's Second Termination

**76.** On or about October 21, 2022, Arres recommended that the Board uphold his recommendation to terminate Plumtree that the Board used to initiate charges against Plumtree.

**77.** On October 21, 2022, Plumtree submitted a memorandum to be considered by the Board where he outlined in explicit detail, the City's unlawful quota system and that it was creating considerable discontent within the Department.

**78.** The Board held a special meeting on Monday, October 24, 2022 to discuss Plumtree's termination among other items.

**79.** The Board's disciplinary system failed to provide Plumtree with a full, fair, and impartial hearing in the following ways:

    **a.** Not providing Plumtree with any hearing whatsoever;

    **b.** Allowing Arres and investigator Williams to be present for the Board's closed session deliberations;

    **c.** Unanimously voting—in closed session— to terminate Plumtree's employment;

    **d.** Never serving Plumtree with a written copy of his termination decision,[1] and instead allowing Arres to verbally inform Plumtree that he was terminated.

## **COUNT I VIOLATION OF CIVIL RIGHTS – DUE PROCESS (BOFPC)**
### **Plaintiff v. All Defendants**

**80.** Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**81.** Defendant Board is a statutorily created administrative agency under 65 ILCS 5/10-2.1-1.

**82.** The Board maintains the sole authority to appoint or terminate a police officer.

**83.** Plumtree was hired on April 19, 2021 as a Naperville police officer for a probationary period of 18 months.

---

[1] Plumtree finally received a written copy of the Board's decision in response to his Freedom of Information Act request on or about November 18, 2022.

**84.** Arres unilaterally terminated Plumtree on October 14, 2022.

**85.** At all relevant times, Plumtree held his position for over 18 months when his probationary period ended on October 18, 2022.

**86.** Until Plumtree was placed on administrative leave, he maintained his badge, his uniform, his personal equipment, his employee manuals, and communicated regularly with his employer.

**87.** On October 19, 2022, Arres rescinded Plumtree's termination and stated that he was arbitrarily extending Plumtree's probationary period by 30 days.

**88.** After an officer is appointed, the employee's probation period may not be increased. *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490 (2010).

**89.** Accordingly, Arres' attempt to extend Plumtree's probation had no force of law and Plumtree was no longer a probationary officer when the Board upheld the termination decision without giving Plumtree a full and impartial hearing based on Arres' charges lobbied against him.

**90.** Plumtree had a protected property interest in his position as a police officer under the Due Process Clause of the Fourteenth Amendment.

**91.** Plumtree's property interest derives from Illinois law, BOFPC's Rules, and Village ordinances.

**92.** As a police officer, Plumtree was entitled to a "just cause" termination before an impartial BOFPC within 30 days of any written charges filed against her and an opportunity to be heard.

**93.** "Cause" in Illinois has been defined as "some substantial shortcoming which renders [the employee's] continuance in her office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for her no longer occupying the place."

**94.** Plumtree's due process rights were violated when Arres improperly fired Plumtree and again when Arres improperly extended his probationary period, essentially "chang[ing] the rules in

the middle of the game" based on allegations arising from the Department's unlawful traffic stop quota.

95. The Board further violated Plumtree's due process rights by not allowing him a full, fair and impartial proceeding and merely upholding Arres' termination recommendation.

96. The Board further violated Plumtree's due process rights in the following ways:

    **a.** Failing to vote on Plumtree's termination in open session in violation of the Illinois Open Meetings Act;

    **b.** Allowing Defendant Arres and the investigating officer, Michaus Williams, to attend the closed session discussing Plumtree's termination that created an appearance of impropriety, if not an actual conflict of interest See Barnich v. Business of Prof. People;

    **c.** Failing to grant Plumtree an evidentiary hearing before an impartial Board; and

    **d.** Failing to serve Plumtree with a written copy of its termination decision.

97. The Board denied Plumtree any process at all because no hearing ever occurred in any official proceeding or final order rendering Plumtree's termination as a police officer ineffective and in violation of federal law, state law, and Village ordinance, and therefore should be rescinded

WHEREFORE, Plaintiff, Clayton Plumtree respectfully requests that this Court enter an order against Defendants City and Board to rescind his termination and reinstate him to his position as a patrol officer; to be made whole for all losses, including back pay, and back benefits with interest, pension losses; compensatory damages in an amount to be determined at trial to compensate Plaintiff for the humiliation, anguish, and emotional distress caused by Defendants City's and Board's conduct; and any other relief that this Court deems just and equitable. Such back pay continues from the start date of October 24, 2022.

## COUNT II 42 U.S.C. § 1983 SUPERVISORY AND/OR INDIVIDUAL LIABILITY DEFENDANTS

**Plumtree v. Defendant Arres**

**98.** Plaintiff realleges each paragraph of this Complaint as if fully restated here.

**99.** Defendant Arres enforced a policy that required every police officer to make, at a minimum, two traffic stops for every shift, which is contrary to Illinois law.

**100.** If an officer failed to meet the required number of monthly stops, Arres would order that the underperforming officer be subject to an informal investigation and/or verbal memos imposing and/or threatening to impose discipline on the officer.

**101.** Defendant Arres issued or directed to be issued informal investigations or counseling memos reprimanding certain officers for failing to meet the mandatory minimum requirements for traffic stops in 2022 and were told that they would be disciplined and/or monitored for failing to meet the requisite traffic stop goals for 2022.

**102.** Plumtree met and exceeded the mandatory minimum expectations for traffic stops throughout 2021 until he was unlawfully put on administrative leave.

**103.** However, due to the continued pressure to meet his quota, Razionale began changing some of Plumtree's traffic stops to list himself as the primary officer.

**104.** Razionale's decision to add himself to Plumtree's traffic were in whole or in part a result of the promulgated and authorized policy, practice, custom or policy of mandatory two traffic stops per shift and the threatened discipline for violation of this policy.

**105.** Arres never investigated the validity of the traffic stop quotas and instead placed Plumtree on administrative leave, terminated him, rescinded the termination and extended Plumtree's probationary period, then recommended his termination before the Board, and then improperly sat in the Board's closed session during its deliberations about his termination recommendation.

106. As a direct and proximate result of the alleged willful and reckless acts and omissions of Arres, Plaintiff was deprived of federally protected rights in violation of 42 U.S.C. § 1983, and has suffered injuries, including, but not limited to, pain and suffering, and lost wages and benefits.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare the conduct of Defendant Arres to violate the rights guaranteed to Plaintiff under appropriate federal law;

B. Grant Plaintiff any consequential, compensatory, punitive, and any other damages that the Court may deem appropriate as against Defendant in his individual capacity;

C. Grant Plaintiff his attorney's fees, costs, and disbursements; and

D. Grant Plaintiff such further relief as the Court deems necessary and proper in the public interest.

## COUNT III 42 U.S.C. § 1983 MONELL CLAIM
### Plumtree v. Defendant City

107. Plaintiff realleges each paragraph of this Complaint as if fully restated here.

108. Defendant City has the ultimate responsibility and authority to train and supervise officers of the Naperville Police Department regarding the appropriate policies and procedures to use to comply with state and federal laws.

109. Defendant Arres, as a final policymaker for the City, enforced unlawful traffic stop quotas and unlawful employment conduct and termination practices.

110. Defendant City as a matter of custom, policy and and/or practice, failed to adequately and properly investigate the ticket quota system, the disciplinary recommendations or actions stemming from the unlawful quota system, and failed to perform a thorough investigation into

all the events relating to Plaintiff's purported misconduct and any other constitutional, statutory, or common law violations of Plaintiff's rights.

111. Defendant City allowed, acquiesced, promulgated, tolerated, authorized and/or permitted a custom, policy, practice and/or procedure that required its officers to conduct at least two mandatory traffic stops per shift.

112. On belief, Defendant City allowed, acquiesced, promulgated, tolerated, authorized and/or permitted a custom, policy, practice and/or procedure of using traffic stops improperly to generate income for the City and to bully, harass, or otherwise inconvenience private citizens.

113. On further belief, Defendant City allowed, acquiesced, promulgated, tolerated, authorized and/or permitted a custom, policy, practice and/or procedure of using traffic stops based on implicit or unconscious bias.

114. Defendant City failed to thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding Plumtree's termination.

115. Defendant City is liable for the damages Plaintiff suffered as a result of the conduct of its employees, agents, and servants, in that after learning of their employees' violation of Plaintiff's constitutional rights, they failed to remedy the wrong.

116. Defendant City created a policy or custom under which unconstitutional practices occurred and were allowed to continue.

117. Defendants are responsible for the violation of Plaintiff's constitutional rights because Defendants Arres and City, each and collectively, were deliberately indifferent to a custom, pattern, practice, or policy of forcing its police officers to execute unlawful or unwarranted

traffic stops, or otherwise engaged in conduct resulting in the violation of constitutional, statutory, or common law rights of police officers and private citizens.

118.    By the aforementioned actions and/or inactions, Defendant City, as a matter of custom, policy and practice, deprived Plaintiff of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as well as violations under 42 U.S.C. § 1983.

119.    As a direct and proximate result of the aforementioned actions and inactions by Defendant City, Plaintiff sustained injuries including: mental anguish, shock, embarrassment, humiliation, damage to reputation, disruption of personal life, loss of wages, and other damages known and unknown.

WHEREFORE, Plaintiff respectfully requests that this Court:

   A.  Declare the conduct of Defendant City to be in violation of the rights guaranteed to Plaintiff under appropriate federal law;

   B.  Order Defendant City to make whole Plaintiff by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices, including, but not limited to, any and all appropriate equitable and prospective injunctive relief;

   C.  Grant Plaintiff any consequential, compensatory, punitive and any other damages that the Court may deem appropriate as against Defendants in their individual capacities;

   D.  Grant Plaintiff his attorney's fees, costs, and disbursements; and

   E.  Grant Plaintiff such further relief as the Court deems necessary and proper.

### COUNT IV - DENIAL OF EQUAL PROTECTION UNDER 42 U.S.C. § 1983
**Plumtree v. Defendants City, Board, and Arres**

120.    Plaintiff realleges each paragraph of this Complaint as if fully restated here.

121. Defendants City and Board, through its employees and agents and at the behest of Defendant Arres intentionally targeted Plumtree for unequal treatment under the law, including that:

    a. Plumtree was the only officer terminated for his role in the purported misconduct arising from Razionale attaching himself to Plumtree's stops;

    b. Razionale was permitted to resign before he was fired;

    c. Sergeant Heun received a 15-day suspension despite suggesting and having knowledge of Razionale adding himself to Plumtree's traffic stops;

    d. Commander Deuchler did not receive any punishment despite having knowledge and allowing the practice "so long as everyone met their traffic stop quotas;"

    e. Arres unilaterally terminated Plumtree, rescinded his termination, and extended Plumtree's probationary period—despite not having authority to take any of the aforementioned actions;

    f. Arres defamed Plumtree by improperly claiming that he committed was fired for committing integrity violations even though he lacked authority to terminate him;

    g. Not allowing Plumtree to be heard before an impartial Board;

    h. Not terminating another officer that may have been a probationary officer even though that officer was accused of writing ghost tickets; and

    i. Closing out the informal investigations of officers who allegedly were under an informal investigation for failing to meet their traffic stop quotas.

122. Defendants City, Board, and Arres all intentionally subjected Plaintiff to less favorable terms and conditions of his employment than other similarly-situated police officers under

Defendant Arres' command, and Defendants can assert no rational basis for the difference in treatment.

123. The acts and omissions alleged herein were committed with the knowledge, acquiescence, and active participation of Defendant Arres and various employees and agents of Defendants City and Board.

124. On belief, Defendants retaliated against Plumtree in the aforementioned ways because he publicly outlined the problems and illegalities of the traffic stop quota system before he was fired.

125. Defendants acted according to both the written traffic stop quota and unwritten and unofficial policies of the City of Naperville.

126. Defendants' aforementioned conduct are each without legal basis as applied and because traffic stop quotas are unlawful; and Arres was without authority to both terminate Plumtree and extend his probationary period.

127. Said Defendants, acting under color of law, had no conceivable basis for their action other than spite or some other improper personal motive, which were unrelated to the Defendants' official duties.

128. Accordingly, Defendants City and Board, at the behest and direction of Defendant Arres violated Plumtree's rights because of Arres' spiteful effort to punish and cause career detriment to Plaintiff by subjecting him to unwarranted discipline, including, but not limited to, causing Plaintiff to be fired from the Naperville Police Department on two separate occasions.

129. The actions of Defendants in singling Plumtree out as a class unto himself among other police officers as alleged in this Complaint were vindictive and taken with a malicious animus and without any rational basis or legitimate governmental purpose, and, therefore, constitute a

deprivation of Plaintiffs' rights to equal protection of law as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and, thus, Defendants are liable to plaintiff under 42 U.S.C. § 1983.

WHEREFORE, for the foregoing reasons, Plaintiff, Clayton Plumtree requests that this Court enter judgment in his favor and against Defendants City, Board, and Arres in an amount to be proved at trial, including for general compensatory, special, consequential damages, for emotional distress and privacy violations, for attorneys' fees under 42 U.S.C. § 1988, and for all such other relief to which he is entitled and the Court deems just and proper.

### COUNT V ADMINISTRATIVE REVIEW
**Plumtree v. Defendants City and Board**

130.    Plaintiff realleges each paragraph of this Complaint as if fully restated here.

131.    Plaintiff brings this Count pursuant to 735 ILCS 5/3-101 et seq. against the Defendant City and Board for the Board's October 24, 2022 decision, which resulted in a final judgment of termination

**The Findings of Fact Are Against the Manifest Weight/Clearly Erroneous, and Termination Lacks Just And Sufficient Cause.**

132.    The Board is a statutorily created administrative agency under 65 ILCS 5/10-2.1-1 *et seq*.

133.    The Board issued its decision (Exhibit A) on October 24, 2022.

134.    This Complaint in this matter is timely brought within 35 days after service of the decision on Plaintiff.[2]

135.    The decision is an administrative decision within the meaning of the ARL because it affects Plaintiff's legal rights by terminating his employment with the Naperville Police Department and also because the decision terminates the proceedings before the Board.

---

[2] Plumtree was never served with written notification of the Board's decision until he received the City's response to his FOIA request on or about November 18, 2022.

136. The Rules and Regulations of the Board expressly adopted the provisions of the ARL, stating, "[f]iling time for administrative review actions will be calculated from the date of service of the Board's Final Decision, i.e., thirty - five (35) days, pursuant to provisions of the Administrative Review Law." Rules and Regulations of the Board §§1.01-1.02.

137. The Board's Decision must be reversed for one or more of the following reasons:

    a. The Board's Decision is contrary to law;

    b. The Board's Decision is against the manifest weight of the evidence in that all of the factual findings in the decision fall outside the permissible scope of the City's policies, ordinances, state or federal law;

    c. The Board's conclusions of law are unsupported by sufficient evidence and/or contrary to law;

    d. The Board never heard Plumtree's matter on the merits before an impartial administrative body;

    e. The Board's Decision is not sufficiently clear and does not sufficiently demarcate between findings of fact and conclusions of law, thereby precluding meaningful judicial review of the Decision altogether; and

    f. The Board's termination decision is based on allegations that arose from an illegal traffic stop quota and is not based upon a substantial shortcoming rendering the continuation of Plaintiff in the service detrimental to the discipline or efficiency of the service to require termination.

## Answer Consisting of Entire Record and Certification

138. Plaintiff requests that the Board file an answer consisting of the transcripts of all proceedings before the Board exhibits offered to and entered into evidence. The full and

complete Board file shall be filed by the Board as part of the record, as well as a certified copy of the entire record of proceedings under review.

WHEREFORE, Plaintiff requests that the Court enter an order reversing the Board's decision in its entirety, and order Plaintiff reinstated and made whole for all losses in connection with such decision, and/or enter instructions that the Board shall order the Sheriff to make Plaintiff whole for all losses in connection with his termination, including for lost pay, benefits, seniority, other emoluments and benefits of employment, and that this Court order such other relief as it deems just and proper.

## COUNT VI DEFAMATION PER SE (state law claim)
### Plumtree v. Arres

139. Plaintiff realleges each paragraph of this Complaint as if fully restated here.

140. On October 14, 2022, Arres terminated Plumtree (Termination #1).

141. Shortly after Arres terminated Plumtree, Arres sent an email to the entire Naperville police Department informing every sworn and unsworn employee that Plumtree was fired.

142. Arres also attended roll call meetings specifically to inform other officers and employees that he fired Plumtree due to "integrity issues."

143. Since Arres lacked authority to terminate Plumtree, Arres disseminated news of Plumtree's termination despite clearly lacking authority to terminate him in the first place, which was deliberate or in reckless disregard to Plumtree's rights.

144. The issues surrounding his forced resignation were disparaging to plaintiff's professional reputation as a police officer.

145. Arres knew or should have known that any such statements about Plumtree's termination were false, or at least misleading, at the time they were made.

146.  Arres' statements are defamatory on their face because they are so obviously and materially harmful to Plaintiff in that the defamatory statements above impute a want of integrity in the discharge of Plumtree's employment, prejudice Plumtree by imputing a lack of ability in her profession, claiming that she is a dishonest, erratic, and an overall problematic employee.

147.  The third parties to whom Arres published the defamatory statements to include other police officer and employees and various government agencies.

148.  The full extent of the third parties to whom Arres published the defamatory statements to and the additional statements that Arres published will be discovered further during discovery.

149.  Plaintiff is informed and believes, and thereon alleges, that Arres by herein described acts, negligently, recklessly, and intentionally caused several unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons.

150.  These specific statements are not susceptible to an innocent interpretation and were made with the intent to inflict serious personal and professional harm.

151.  In acting as described above, Arres did not publish these statements in the public concern, but rather, published these fictitious and injurious statements without consent, legal justification, legitimate cause, or any other legal excuse.

152.  The communications defaming Plumtree were not done in the scope of, nor in furtherance of, defendants' employment with Defendant City, and were unrelated to, and not done in furtherance of, any legitimate purpose of Defendant City.

153.  As a result of the defamation, plaintiff suffered irreparable damage to his personal and professional reputation and a diminished ability to obtain future employment.

WHEREFORE, the foregoing reasons, Plaintiff, Clayton Plumtree seeks entry of judgment in his favor and against Defendant Arres, and all available relief against in his favor and against

Defendant Arres, including the appropriate presumed, compensatory, consequential, special, damages, and costs in an amount to exceed $50,000.00, and for all such other relief to which he is entitled, and the Court deems just and proper.

## COUNT VII INDEMNIFICATION

154. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

155. Defendant City is a municipal corporation required to assume financial responsibility for the actions committed by its officials or employees, including the individual Defendants and the City within the meaning of 735 ILCS §10/9-102.

WHEREFORE, for the foregoing reasons, Plaintiff Clayton Plumtree requests that this Court enter judgment in his favor and against Defendants and order Defendant City of Naperville, Illinois, to indemnify the other Defendants.

## JURY DEMAND

156. Plaintiff Clayton Plumtree demands a trial by jury on all issues so triable.

## COMMON PRAYER FOR RELIEF

WHEREFORE, and that there is sought, Plaintiff prays that this Honorable Court:

a) Conduct a mediated settlement conference or refer the case to its court-annexed mediation program to assist the parties to bring about a settlement of this case;

b) Enter judgment in the Plaintiff's favor and against Defendants;

c) Order affirmative relief necessary to eradicate the effects of the Defendants' unlawful employment practices;

d) Award the Plaintiff actual damages suffered to the extent permissible by law to compensate the Plaintiff for injuries and losses caused by Defendants' conduct;

e) Award the Plaintiff compensatory damages to the extent permissible by law to compensate the Plaintiff for injuries and losses caused by Defendants' conduct;

f) Award Plaintiff exemplary damages to the extent permissible by law against the individual defendants only;

g) Award the Plaintiff prejudgment interest on these damages;

h) Grant court costs and reasonable attorneys' fees under 42 U.S.C. § 1988 and other applicable law; and,

i) Grant such additional relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

Clayton Plumtree

s/ Gianna Scatchell

By:_____

Plaintiff's Attorney

Dated: November 28, 2022

Gianna Scatchell, Esq.
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 330
F: (312) 846-6363
E: Gia@dispartilaw.com