**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CLAYTON PLUMTREE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 22 C 6635** |
| | ) | |
| **CITY OF NAPERVILLE and JASON ARRES,** | ) | **Judge Rebecca R. Pallmeyer** |
| **police chief, in his official and individual** | ) | |
| **capacities,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clayton Plumtree formerly served as a police officer for the City of Naperville, Illinois. During Plaintiff's employment, the Naperville Police Department ("Department") maintained a policy under which officers were expected to perform at least two traffic stops per day. Plaintiff alleges that he raised concerns about the legality of that policy. In retaliation for those communications, he alleges, Naperville's Police Chief—Defendant Jason Arres—and its Board of Fire and Police Commissioners (the "Board"), terminated him without due process. Defendants have moved to dismiss, arguing that Plaintiff was a probationary officer at the time he was fired and was therefore not entitled to notice or a hearing before being discharged. For the reasons explained below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Clayton Plumtree has served as a police officer in various municipalities for more than 14 years. (Pl.'s Second Am. Compl. ("SAC") [19-2] ¶ 17.) Plaintiff regularly received high praise from his former employers, and had a stellar disciplinary history. (*Id.* ¶¶ 20-24.) In April 2021, Plaintiff began working for Naperville as a probationary police officer. (*Id.* ¶ 18.)

From at least 2019 through 2022, the Department maintained a written "Traffic Stop Expectation Policy" that required all officers "to conduct at least two traffic stops per shift."[1]  (*Id.* ¶ 31.)  While the policy was in effect, Department "supervisors and other police officers, including Plumtree, verbally expressed their concerns and opposition" to it.  (*Id.* ¶ 38.)  The record is unclear about when or for how long these officers expressed those concerns, but it appears that the existence of the policy is undisputed:  In December 2021, the Department's Patrol Deputy Chief and Commander sent a memorandum to patrol personnel explaining that the policy was intended to "[i]ncrease proactive traffic enforcement and community engagement" in order to "solv[e] problems within [Naperville's] community."  (*Id.* ¶ 31.)  The memo also warned, without specifics, of consequences for failure to comply, stating that "[o]fficers who do not meet expectations and cannot demonstrate they were consistently working [on other assignments] will be held accountable."  (*Id.*)  Plaintiff alleges that the policy was controversial; he says it generated five "Office of Professional Standards investigations" within the Department and has caused "considerable discontent" and "heated discussion[s]" within the patrol division.  (*Id.* ¶¶ 37, 39-40.)

In April 2022, at an officer roll call, Plaintiff's supervisor, Sergeant Heun, stated: "Plumtree makes a lot of traffic stops. If you [an officer not meeting his or her quota] need some numbers, just take some of his."  (*Id.* ¶¶ 40-41.)  Another patrol officer, Officer Razionale, had not been meeting his quotas and faced potential discipline.  (*Id.* ¶ 43.)  Plaintiff alleges that both he and Razionale "understood Heun's statement to mean that . . . Razionale could add himself to some of [Plaintiff]'s traffic stops."  (*Id.* ¶ 45.)  Razionale then began changing some of both Plaintiff's and Heun's traffic stop reports—listing (*i.e.*, "adding") himself as the primary officer and Plaintiff or Heun as the backup officer.  (*Id.* ¶¶ 46-47.)

---

[1]     The Department apparently discontinued the traffic stop expectation policy "around the time" Plaintiff sued and "no longer enforces any kind of traffic stop expectations or disciplines officers for not meeting the policy of effectuating two traffic stops per shift."  (SAC ¶ 140.)  Plaintiff filed his initial complaint [1] on November 28, 2022, and filed the SAC on March 15, 2023.

Around August 16, 2022, Plaintiff notified Sergeant Heun that Razionale was "taking credit for [Plaintiff]'s stops," but Heun did not object, nor did he "tell [Plaintiff] that such conduct was against Department Policy." (*Id.* ¶¶ 47-48.) Plaintiff also alleges that Heun told his own supervisor, Commander Deuchler, about Razionale's conduct, and that Deuchler responded by saying that the practice fell in a "gray area," but that it was permissible "so long as everyone met their traffic stop quotas." (*Id.* ¶ 50.)

Razionale continued "adding" himself to Plaintiff's stops—with Plaintiff's and Sergeant Heun's knowledge—until late August 2022, when Commander Deuchler directed Heun to discontinue the practice. (*Id.* ¶¶ 52-57.) Heun passed along that message to Razionale, but not to Plaintiff. (*Id.* ¶¶ 59-60.) On September 2, 2022, Plaintiff was summoned to the police station prior to his shift, notified that he was under investigation for the traffic stops falsely attributed to Razionale, and placed on paid administrative leave. (*Id.* ¶ 62.)

On October 14, 2022, after the Department investigated Plaintiff's conduct, Defendant Arres, Naperville's Police Chief, unilaterally terminated Plaintiff for violating the Department's general orders that "[o]fficers shall be truthful and complete . . ." and that "[e]mployees shall not make false or untrue statements during the course of their duties[.]" (*Id.* ¶¶ 64-65.) Arres reported Plaintiff's termination in a department-wide email. (*Id.* ¶ 66.) Arres also spoke about the termination in Department meetings, reported Plaintiff to the DuPage County and Will County State's Attorney's Offices for "*Brady* violations," and reported Plaintiff to the Illinois Law Enforcement Training and Standards Board "to prevent him from ever being hired as a police officer" again. (*Id.* ¶¶ 70, 72-73.)

On October 19, 2022, one day after Plaintiff's probationary period would have expired, Arres "rescinded his unilateral termination of [Plaintiff] after receiving notice from the Naperville Fraternal Order of Police . . . that he lacked [the authority] to unilaterally fire [Plaintiff]." (SAC ¶ 81.) According to Board rules, probationary officers may be discharged "after the Police Chief has received from the Board a notice in writing that the Board has approved the discharge."

(Defs.' Mem., Ex. B ("Rule 4.17") [23-2].)  In contrast, an officer who has successfully completed probation may be discharged only "after a hearing before the Board of Fire and Police Commissioners as provided by law."  (SAC ¶ 15.)  The same day that Arres rescinded his termination of Plaintiff, Arres extended Plaintiff's "probationary period for an additional 30 days for 'disciplinary purposes,'" another action Plaintiff alleges that Arres was not authorized to take. (*Id.* ¶ 82.)  Plaintiff asserts that his probationary status was extended "in retaliation for the Naperville FOP's letter [to Arres about Plaintiff's unlawful termination] and public support of [Plaintiff]."  (*Id.* ¶ 83.)

Plaintiff never received any hearing, though he would have been entitled to one if he were a full-time officer at the time he was terminated.  (*Id.* ¶ 88(a).)  On or about October 21, 2022, Arres submitted a recommendation to the Board to terminate Plaintiff.  (*Id.* ¶ 85.)  That same day, Plaintiff submitted a memorandum to the Board outlining "the City's/Arres's improper traffic expectation system and further communicated that this policy created considerable confusion and discontent within the Department, which led to Arres's charges against him."  (*Id.* ¶ 86.)  On October 24, 2022, the Board met—with Arres, but not Plaintiff, in attendance—to discuss Arres's recommendation to terminate Plaintiff.  (*Id.* ¶ 87-88.)  There, the Board voted unanimously to terminate Plaintiff.  (*Id.* ¶ 88.)

Plaintiff filed this suit in November 2022 [1].  After Defendants moved to dismiss [11], Plaintiff sought leave to file an amended complaint [15], which this court granted [17].  When Plaintiff conferred with Defendants about various factual allegations to which they objected, Plaintiff sought [19] and received [21] leave to file the operative Second Amended Complaint [19-2].  Plaintiff's six-count Second Amended Complaint asserts claims against (I) Defendants collectively for violating his due process rights in terminating him, (II) Arres individually for civil rights violations under 42 U.S.C. § 1983, (III) Naperville for § 1983 *Monell* violations, (IV) Naperville for Illinois state law administrative review pursuant to 735 ILCS 5/3-101 *et seq.*, (V)

Arres for state law defamation *per se*, and (VI) Naperville, claiming that the City must indemnify Arres on these claims. Defendants have moved to dismiss counts I through V [22].

## DISCUSSION

To withstand a Federal Rule of Civil Procedure 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[R]ecitals of the elements . . . supported by mere conclusory statements, do not suffice." *Id*. While the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citation omitted), a complaint need only be "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

At this stage, the court presumes the truth of Plaintiff's allegations. *Lett v. City of Chi.*, 946 F.3d 398, 399 (7th Cir. 2020) (citation omitted). Although plaintiffs must state sufficient facts "about the subject-matter of the case to present a story that holds together," *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010), they need not "come forward with evidence to survive a motion to dismiss." *Hunt v. Dart*, No. 07 C 6003, 2010 WL 300397, at *4 (N.D. Ill. Jan. 22, 2010) (citation omitted). Further, matters of public record such as "city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice." *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

For the reasons set forth below, Defendant's motion to dismiss Plaintiff's Second Amended Complaint is granted with respect to Counts II and IV, but otherwise denied.

I.        **Counts I and III: Due Process**

In Count I of his complaint, Plaintiff asserts that Defendants violated his due process rights when on October 14, 2022 Arres unilaterally terminated Plaintiff and on October 24, 2022 the Board itself terminated Plaintiff—allegedly in violation of internal procedures.  (SAC ¶¶ 89-111.)

To state a claim under 42 U.S.C. § 1983 for a violation of due process, a plaintiff must show "(1) that he had a constitutionally protected property interest; (2) that he suffered a loss of that interest amounting to a deprivation, and (3) that the deprivation occurred without due process of law."  *Younge v. Berman*, No. 3:22-cv-50099, 2023 WL 2374781, at *3 (N.D. Ill. Mar. 6, 2023) (citing *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 360 (7th Cir. 2005)).

Defendants argue that, because Plaintiff was a probationary officer at the time he was fired, Plaintiff "did not have a property interest in continued employment, and thus, was not entitled to due process."  (Defs.' Mem. [23] at 5.)  Plaintiff responds that his probationary period "was completed before he was fired," meaning that he was a full-time officer entitled to due process. (Pl.'s Mem. [32] at 6.)  The dispositive question is Plaintiff's probationary status at the time he was terminated.

The Due Process Clause creates certain constitutionally-protected property interests in government employment.  *See Bishop v. Wood*, 426 U.S. 341, 350 (1976).  Those property interests "are created and their dimensions are defined by . . . state law." *Cage v. Harper*, 42 F.4th 734, 738 (7th Cir. 2022) (citation omitted).  To sustain a finding of "a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of [Defendants] to discharge him."  *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021) (quoting *Krecek v. Bd. of Police Comm'rs of La Grange Park*, 271 Ill.App.3d 418, 423, 646 N.E.2d 1314, 1318-19 (1st Dist. 1995)).  Illinois law

provides that otherwise lawful collective bargaining agreements ("CBA") between "a public employer and a labor organization" supersede public law. *See* 5 ILCS 315/15(b) (2010).[2]

Two documents embraced by Plaintiff's complaint—the collective bargaining agreement between Naperville and the police union, and the City of Naperville Board of Fire and Police Commissioners Rules ("Rules")—address when and how probationary police officers become full-time officers. Section 16.21 of the CBA states in its entirety: "The probationary period of a newly hired officer shall be eighteen (18) months from the date of hire. The Chief shall have the sole discretion to extend the period for training or disciplinary purposes." (*See* Defs.' Mem. Ex. A ("CBA Section 16.21") [23-1].) The Rules, on the other hand, are more detailed. They provide as follows:

> All persons newly appointed as police officers to the City of Naperville Police Department shall be considered probationary employees for a period of at least eighteen (18) months. The Board may extend the original probationary period for a police officer for an additional six (6) months upon the recommendation of the Police Chief. A probationary employee is an employee-at-will.
>
> . . . .
>
> A probationary employee is not entitled to a hearing before the Board, and the action of the Board is final. No grievance shall be presented or entertained in connection with such suspension or termination of any probationary employee.
>
> The Board shall consider the written recommendation of the Police Chief to appoint to full-time, non-probationary status or terminate, and shall act upon that recommendation by either appointment or termination. In no case shall a probationary police officer be discharged until after the Police Chief has received from the Board a notice in writing that the Board has approved the discharge.

(*See* Rule 4.17.)

According to Defendants, the question of Plaintiff's probationary status is simple: because on October 19, 2022 "Chief Arres extended Plaintiff's probationary period by 30 days," Plaintiff

---

[2] The court cites the 2010 version of 5 ILCS 315/15(b) because the Illinois Supreme Court struck down Public Act 98-599—which in 2014 amended unrelated portions of that section—as unconstitutional. *See In re Pension Reform Litig.*, 32 N.E.3d 1, 30, 2015 IL 118585 ¶¶ 95–96 (Ill. 2015). The relevant portion of the 2010 version was unchanged by the 2014 amendments (and therefore survived the Illinois Supreme Court's decision).

remained a probationary, at-will employee for an additional 30 days beyond October 18, when he would otherwise have completed his probationary period. (Defs.' Mem. at 5.) The court agrees with Defendants that, if Plaintiff remained a probationary officer on October 24—when the Board approved Chief Arres's recommendation to fire him—he did "not possess a property interest in continued employment and as a result ha[d] no right to procedural due process before [his] employment may be terminated." (Defs.' Mem. at 7 (citing *Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011)).)

The question, then, is whether Chief Arres was authorized to extend Plaintiff's probationary period on October 19, one day *after* the 18-month probationary period was set to lapse. If Arres properly extended Plaintiff's probation, Plaintiff's claim must be dismissed. The CBA does give Arres the right to extend Plaintiff's probationary period while Plaintiff was still on probation.[3] (*See* CBA Section 16.21.) But, construing Plaintiff's complaint in the light most favorable to him and drawing reasonable inferences in his favor, the court concludes that Plaintiff may *not* have been on probation as of October 19. According to the CBA, the probationary period for a newly hired officer like Plaintiff "*shall be* eighteen (18) months from the date of hire." (*Id.* (emphasis added).) Read on its own, the interpretation most favorable to Plaintiff is that the probationary period is a firm eighteen months unless extended. In other words, unless the Police Chief extends that period for "training or disciplinary purposes" during the officer's 18-month probation window, the probationary period ends. (*Id.*)

On the other hand, reading the Rules on their own suggests something different. Unlike the CBA, the Rules provide that the probationary period is "*at least* eighteen (18) months." (Rule 4.17 (emphasis added).) And unlike the CBA, the Rules create a procedure for the Board

---

[3]     That said, the Rules suggest that the Board is the entity authorized to "extend the original probationary period" of a police officer "upon the recommendation of the Police Chief." (*See* Rule 4.17.) As discussed below, this is another arguable conflict between the Rules and the CBA.

to "consider the written recommendation of the Police Chief to appoint [probationary officers] to full-time, non-probationary status[.]"  (*Id.*)  The Rules, then, suggest that one cannot become a non-probationary officer without explicit action by the Chief and the Board.  Put differently, the Rules seem to contemplate that, until a determination is made by the Board to promote or fire an officer, that officer remains on probationary status.

Reading the CBA and the Rules together leaves the court unable to determine, as a matter of law, what happens when an officer has been on the job for 18 months and one day.  But the Rules address what happens in the event of a "conflict between any Board rule and the terms of an applicable collective bargaining agreement covering the City's fire and police department personnel[.]"  *See* City of Naperville Board of Fire and Police Comm'r's, Rule 1.03 (2020), https://www.naperville.il.us/contentassets/e9b0ceb630434be880e5096d0ba5190e/bofp-rules-and-regs.pdf.  (last visited Aug. 11, 2023).  According to Rule 1.03, while the Rules and the CBA "shall be read together and deemed complementary to each other wherever possible," the CBA provisions "shall prevail if there is a direct conflict, and the agreement and rule cannot be read together."  *Id.*  Read in the light most favorable to Plaintiff, the court holds that there is a direct conflict in the probationary provisions of the CBA and the Rules.  The CBA states simply that the probationary period "shall be" 18 months.  (CBA Section 16.21.)  The Rules say something different.  Though the record might ultimately show how the two can be "read together and deemed complementary," the court cannot make that determination at this stage.

Accordingly, reading the CBA on its own, Plaintiff has sufficiently alleged that he was a non-probationary officer at the time he was fired on October 24, 2022.  Because Defendants do not dispute that Plaintiff was denied the due process that would be due to a full-time officer,

Plaintiff has pled a viable due process claim.[4]  Defendants' motion to dismiss Count I of the SAC is denied.

Defendants make essentially the same arguments in seeking to dismiss Plaintiff's claim that Naperville is liable, under the *Monell* doctrine, for violating his right to due process.[5]  As discussed above, Plaintiff has sufficiently alleged the "underlying constitutional violation." *Schor v. City of Chi.*, 576 F.3d 775, 779 (7th Cir. 2009).  To establish direct liability against Naperville for that violation, Plaintiff must prove "(1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at a minimum, deliberate conduct; and (3) causation, which means the municipal action was the 'moving force' behind the constitutional injury." *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 598 (7th Cir. 2019) (citation omitted).  Because Defendants have only focused on the underlying constitutional violation, the court does not address these elements, other than to note that Arres and the Board are both likely capable of undertaking a "municipal action."  Because, but for the termination vote, Plaintiff would plausibly have been a full-time officer with a property interest in continued employment—and because Plaintiff was not afforded the process due to such an officer—Naperville faces liability pursuant to *Monell*.

## II.    Count II: Due Process (Supervisory Liability)

In Count II of his complaint, Plaintiff asserts a § 1983 claim against Arres in his official supervisory capacity for depriving Plaintiff of his federally-protected rights.  Defendant moves to dismiss Count II as redundant to the *Monell* claim against Naperville in Count III.  (Defs.' Mem. at 7.)  Indeed, courts routinely dismiss § 1983 claims against individual defendants in their official

---

[4]    The court need not reach Plaintiff's alternative theory that he had a property interest in probationary public employment established by a "clear policy statement."  (*See* Pl.'s Mem. at 9–11.

[5]    Defendants correctly note that Plaintiff can only bring a *Monell* claim based on conduct which violated *his* constitutional rights—*i.e.*, Arres and the Board's decision to terminate him without due process—not the allegedly unconstitutional traffic stop policy itself, which at most violated the rights of Naperville drivers.

capacity where they duplicate *Monell* claims against a municipality (like Naperville). *See, e.g.*, *Selmani v. Vill. of Bartlett*, 515 F. Supp. 3d 882, 889 (N.D. Ill. 2021). Plaintiff has not responded to this argument. Count II is duplicative of Count III and is therefore dismissed.

### III.      Count IV: Administrative Review

In Count IV, Plaintiff brings a claim for administrative review under the Administrative Review Law, 65 ILCS 5/10-2.1-1. Defendants challenge this claim on two grounds. The first fails for the reasons already addressed: Defendants contend that because Plaintiff was a probationary officer, he had no right to an administrative hearing in the first place. As discussed above, however, Plaintiff has asserted a plausible claim that he had the status of a full-time officer, so the court rejects that argument.

Defendants' second argument has more traction. Specifically, they contend that there has been no "final administrative decision" in Plaintiff's case, as required by the statute. (Defs.' Mem. at 11.) The Administrative Review Law governs judicial review of "final administrative decisions" of entities like the Board. *See* 735 ILCS 5/10-2.1-17. A final "decision" is one that "affects the legal rights, duties or privileges of parties" and "terminates the proceedings before the administrative agency." 735 ILCS 5/3-101. As Defendants note, final decisions follow "some sort of adversarial process involving the parties affected, where a hearing on controverted facts is held, and ultimately a disposition is rendered by an impartial fact finder." *Jagielnik v. Bd. of Trustees of Police Pension Fund of Vill. of Mundelein*, 569 N.E.2d 1293, 1296, 211 Ill.App.3d 26, 32 (2d Dist. 1991) (quotation and brackets omitted). Without such a decision, this court lacks jurisdiction. *Id.*

In this case, Plaintiff's own allegations establish that there was no "proceeding" before the Board. Plaintiff asserts that the Board issued a decision on October 24, 2022 (*see* SAC ¶ 154), but he also claims that the Board "denied Plumtree any process at all because no hearing ever occurred in any official proceeding." (*Id.* ¶ 111.) As Plaintiff admits, apart from a short "rubber stamped" decision to implement Chief Arres's recommendation (*id.* ¶ 103), there is no record for

this court to review. Certainly there was no adversarial process before an impartial fact finder. Indeed, Plaintiff's due process claim is based on that very failure of process. Perhaps for this reason, Plaintiff did not respond to Defendants' challenges to his claim for claim for administrative review, and the court dismisses it. Should Plaintiff prevail on his due process claim, his request for injunctive relief may include the administrative hearing that all parties agree did not occur.

## IV.    Count V: Defamation

Finally, Plaintiff brings a claim for defamation *per se* based on statements Chief Arres made to "the entire Naperville police Department," to various State's Attorney's offices, and to the Illinois Police Standards Board. Arres moves to dismiss based on the absolute immunity he enjoys under Illinois law as a public official.

Under 745 ILCS 10/2-210, a public employee like Chief Arres "acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information[.]" Plaintiff argues that the statute only immunizes negligent statements, but that is not the law. The Seventh Circuit has made clear that public officials enjoy absolute immunity from defamation liability so long as statements were made in the scope of their duties, an immunity which "cannot be 'overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice.'" *See Horwitz v. Bd. Of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 618 (7th Cir. 2001) (quoting *Klug v. Chicago Sch. Reform Bd. Of Trs.*, 197 F.3d 853, 861 (7th Cir. 1999)); *see also Stevens v. Shelton*, No. 17 C 8710, 2019 WL 129784, at *10 (N.D. Ill. Mar. 18, 2019) ("[T]he case law is clear that Section 2-210 provides absolute immunity").

The dispositive question, then, is whether Chief Arres was acting in the scope of his duties as police chief when he made the following allegedly defamatory claims.

- Arres "emailed the entire Department notifying them of Plumtree's termination." (SAC ¶ 66.)
- Arres "attended various roll call meetings and informed employees that Plumtree was fired due to integrity issues." (*Id.* ¶ 70.)
- Arres "contacted the DuPage County State's Attorney's Office and the Will County State's Attorney's Office falsely alleging that Plumtree committed a '*Brady* violation[.]'" (*Id.* ¶ 72.)

12

- Arres "filed a report against Plumtree with the Illinois Law Enforcement Training and Standards Board to prevent him from ever being hired as a police officer." (*Id.* ¶ 73.)

Because immunity is an affirmative defense, Plaintiff need not plead around it. *See Elliott v. Thomas*, 937 F.2d 338, 345 (7th Cir. 1991). But if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense," the court may dismiss the claim on a motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). As Plaintiff recites, conduct is within the scope of employment "if but only if: (a) it is of the kind [the employee] he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." *Adames v. Sheahan*, 909 N.E.2d 742, 755, 233 Ill.2d 276, 299 (2009).

The complaint does not on its face make clear that Arres made the allegedly defamatory statements within the scope of his employment. The complaint does not say when or where Arres made the statements; nor, more importantly, is it clear whether Arres made the statements to "serve" Naperville or the Department. Documentary evidence and testimony may well show that Arres was at least partially motivated by serving his employer, but Plaintiff has not alleged that. To the contrary, the thrust of the complaint is that Arres took the actions he did to retaliate against Plaintiff for speaking out about the Department's allegedly illegal traffic stop policy.

The caselaw cited by Defendants does not suggest otherwise. While *Szczesny v. Village of River Forest* is factually analogous, plaintiff there alleged, on the "face of the complaint," that the defendants "were acting under Village authority 'with regard to their acts and conduct alleged herein.'" *See* No. 20 CV 5661, 2021 WL 2311972, at *7 (N.D. Ill. June 7, 2021) (brackets omitted) (dismissing defamation claims against police chief and human resources director as barred by absolute immunity). *Taboas v. Mlynczak* is likewise inapposite because, in that case, the Seventh Circuit was reviewing a decision that followed "the traditional summary judgment model," in which the court found facts based on "exhibit evidence." *See* 149 F.3d 576, 581–82 (7th Cir. 1998).

13

Because the court here cannot make factual determinations, and because Plaintiff has not pleaded himself out of court, the court declines to dismiss the defamation count at this time.

## CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss [22] is granted as to Counts II and IV, and denied as to Counts I, III and V.  Plaintiff has leave to file an amended complaint, should he wish to do so, on or before September 15, 2023.[6]  Defendants' answer shall be filed on October 6, 2023, and the parties shall submit their joint Report of Planning Meeting on or before October 20, 2023.

ENTER:

Dated:  August 22, 2023

_____
REBECCA R. PALLMEYER
UnitedStates District Judge

---

[6]     The court notes that Plaintiff's allegations appear consistent with an Illinois state law claim that has not been formally asserted:  the tort of retaliatory discharge.  *Cf. Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations.")  Such a claim requires plaintiff to demonstrate "that (1) he was discharged in retaliation for his activities; and (2) the discharge is in contravention of a clearly mandated public policy."  *Jacobson v. Knepper & Moga, P.C.*, 185 Ill.2d 372, 376, 706 N.E.2d 491, 493 (1998) (citation omitted).

14