UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLAYTON PLUMTREE, | ) |
| Plaintiff, | ) |
| v. | ) Court No: 22-cv-6635 |
| CITY OF NAPERVILLE, et al, | ) |
| Defendants. | ) |

**DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNCONTESTED FACTS[1]**

NOW COME Defendants Jason Arres ("Chief Arres") and City of Naperville ("City"), by and through their attorney, Jennifer Bonner, Senior Assistant City Attorney, pursuant to L.R. 56.1 and in support of their Motion for Summary Judgment hereby state the following uncontested facts:

**LOCAL RULE 56.1(a)(1) FILING**

**Tab #**  **Description**

- A. Chief Arres's Deposition
- B. Clayton Plumtree's ("Plaintiff") Deposition
- C. MDC Conversations
- D. Plaintiff's Interrogation Investigation Transcript
- E. Notice of Allegations and Investigation (Formal)
- F. October 19, 2022 - Email Correspondence re: probation extension
- G. Sections 4.1, 16.21, and Article 9 of the Collective Bargaining Agreement ("CBA")
- H. City of Naperville Board of Fire and Police Comm'r's ("BOFPC"), Rule 1.03 (2020)
- I. October 21, 2022 - Recommendation of Chief Arres
- J. October 21, 2022 – Plaintiff's Memorandum
- K. John Reed's ("Reed") Deposition
- L. October 19, 2022 - Email from Reed to Plaintiff

---

[1] The facts are presumed true for the purpose of resolving this motion, only. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). Defendants retain the right to refute these facts if the motion is denied.

**LOCAL RULE 56.1(a)(3)(A) FILING**

I. **Nature of Claims.**

1. Plaintiff asserts the following claims: a due process violation concerning the way he was terminated (Count I); retaliatory discharge under Illinois law (Count II); a *Monell* claim against the City (Count III); an Illinois defamation claim against Chief Arres (Count V); and an indemnification claim against the City (Count VI). (*See* Pl. Third Am. Compl.)

II. **Facts.**

2. Chief Arres was employed as Chief of Police for the Naperville Police Department ("NPD") during the relevant timeframe of the Third Amended Complaint. (Ex. A, Arres Dep. Tr. 9:5-10.)

3. On April 19, 2021, Plaintiff began working for NPD as a police officer. (Ex. B, Pl. Dep. Tr. 13:22-14:5.)

4. Newly hired police officers with NPD serve a probationary period of eighteen (18) months from the date of hire. (Ex. G, Section 16.21; Ex. K, Reed Dep. Tr. 23:11-22.)

5. Breaks in employment do not count in the calculation of the probationary period. (Ex. K, Reed Dep. Tr. 91:8-92:10.)

6. Police officers are subject to a CBA between the City and the Illinois Fraternal Order of Police Labor Council/F.O.P Lodge #42 ("FOP"). (Ex. K, Reed Dep. Tr. 11:2-12; 15:10-14.)

7. Section 16.21 of CBA provides the police chief has the sole discretion to extend the period for training or disciplinary purposes. (Ex. G, Section 16.21.)

8. FOP negotiates the CBA, represents employees for alleged violations of the CBA, and provides an attorney for questions about the CBA or grievance filing. (Ex. B, Pl. Dep. Tr. 75:18-20; 76:7-12; Ex. K, Reed Dep. Tr. 20:17-21:19.)

9. Section 4.1 of the CBA states that the City retains all traditional rights to manage and direct the affairs of the Police Department…including, but not limited to the following…to discipline, suspend, and discharge non-probationary employees for just cause (probationary employees without cause). (Ex. G, Section 4.1.)

10. Article 9 of the CBA includes extensive grievance and arbitration procedures for police officers to utilize. (Ex. G, Article 9.)

11. The CBA provides grievances must be presented no later than seven (7) business days from the date of the occurrence of the matter giving rise to the grievance or within seven (7) business days after the employee, using reasonable diligence, could have obtained knowledge of the occurrence of the event giving rise to the grievance. If the grievance is not timely made, the issue is considered waived and cannot be pursued further by the lodge or employee. (*Id*.)

12. According to Rule 1.03, BOFPC Rules and the CBA "shall be read together and deemed complementary to each other wherever possible," but the CBA provisions "shall prevail if there is a direct conflict, and the agreement and rule cannot be read together." (Ex. H.)

13. Plaintiff received training during his probationary period and testified that NPD has a good police training program. (Ex. B, Pl. Dep. Tr. 15:15-24.)

14. During Plaintiff's employment, NPD had a policy under which officers were expected to average at least two traffic stops per working day; working days were waived if training or case assignments interfered with their work duties. (Ex. B, Pl. Dep. Tr. 18:14-22; Ex. A, Arres Dep. Tr. 15:14-24.)

15. A traffic stop is pulling over a motor vehicle to the side of the road after observing a traffic violation. (Ex. A, Arres Dep Tr. 35:2-3; Ex. B, Pl. Dep. Tr. 22:23-23:3.)

16. Traffic stops are documented in the computer-aided dispatch ("CAD") and can result in a traffic warning or citation. (Ex. B, Pl. Dep. Tr. 23:6-12; 24:5-6; Ex. A, Arres Dep. Tr. 35:1-11.)

17. NPD officers utilize a mobile data computer ("MDC") to communicate with other officers, run license plates and driver's licenses. (Ex. B, Pl. Dep. Tr. 30:22-31:7.)

18. Plaintiff allowed another NPD Officer, Kenneth Razionale ("Razionale"), who was not meeting traffic stop expectations, to take credit for some of Plaintiff's traffic stops. (Ex. B, Pl. Dep. Tr. 36:18-19; 54:9-15; 57:2-5; 113:8-11.)

19. On April 29, 2022, Plaintiff messaged Razionale on the MDC and told Razionale to "take primary and class w/ a [sic] warning plz:) [sic]." (Ex. C at 1.)

20. From April 29, 2022 through August 25, 2022, on at least twenty different occasions, Plaintiff cleared himself from a traffic stop and listed himself as the backup officer in CAD; this allowed Razionale to take credit as the primary officer. (Ex. C, Ex. A, Arres Dep. Tr. 210:3-21; Ex. D, Pl. Inv. Dep. Tr. 13:11-14; 16:4-21; 43:11-16.)

21. On September 2, 2022, Plaintiff was notified that he was being placed on administrative leave and investigated for violations of NPD General Order 26.4.2(C) Attention to Duty – Conduct and Behavior; NPD General Order 26.4.2(O) Attention to Duty – Department Reports; and NPD General Order 26.4.2(F) Attention to Duty – Truthfulness. (Ex. E, Ex. B, Pl. Dep. Tr. 40:2-5.)

22. As part of the investigation, on September 14, 2022, Plaintiff was interrogated. (Ex. B, Pl. Dep. Tr. 42:18-21; Ex D.)

23. During the interrogation, Plaintiff was represented by a police union attorney. (Ex. B, Pl. Dep. Tr. 43:10-14.)

4

24. During his interrogation, Plaintiff admitted he put inaccurate information into police records concerning traffic stops. (Ex. D, Pl. Inv. Dep. Tr. 23:1-21; 24:1-3; 25:4-7.)

25. On October 14, 2022, Plaintiff went to NPD chief's conference room. (Ex. B, Pl. Dep. Tr. 44:12-16.)

26. Along with Plaintiff, representatives from the union, including the president, Reed and attorney, Tamara Cummings, were there. (Ex. B, Pl. Dep. Tr. 44:12-45:1.)

27. Chief Arres told Plaintiff the NPD General Orders violations were sustained, and he was terminated. (Ex. B, Pl. Dep. Tr. 45:2-8).

28. Plaintiff was provided an opportunity to speak during the meeting but could not recall what he specifically said. (Ex. B, Pl. Dep. Tr. 45:7-14.)

29. From October 14, 2022 to October 19, 2022, Plaintiff was not physically present at NPD nor did he perform any job function. (Ex. B, Pl. Dep. Tr. 62:21-63:1.)

30. On October 19, 2022, the City responded to a request from the police union to allow BOFPC to receive input on Plaintiff's disciplinary matter by rescinding his termination and extending his probationary period for thirty days. (Ex. F.)

31. The City also stated there is no right to a hearing under the BOFPC rules for probationary officers, but the BOFPC would take into consideration any written materials submitted by Plaintiff. (*Id.;* Ex. B, Pl. Dep. Tr. 64:17-24.)

32. On October 19, 2022, Plaintiff was notified during a phone call with Reed that Plaintiff's termination is being rescinded, he is being reinstated as a probationary employee, and the probationary period was extended for thirty days for disciplinary purposes. (Ex. B, Pl. Dep. Tr. 60:6-9; 64:2-5; Ex. K, Reed Dep. Tr. 43:9-15; 70:18-24; Ex. A. Arres Dep. Tr. 144:1-16.)

33. Also, on October 19, 2022, Reed sent an email to Plaintiff asking what day Plaintiff was scheduled to complete his probation. (Ex. L.)

34. Plaintiff was never notified that his probationary period expired. (Ex. B, Pl. Dep. Tr. 63:10-12.)

35. On October 21, 2022, Chief Arres submitted a memorandum to BOFPC recommending Plaintiff's termination. (Ex. I.)

36. Plaintiff received a copy of Chief Arres' memorandum but was unable to call the specific date on which it was received. (Ex. B, Pl. Dep. Tr. 67:6-8; 67:17-19.)

37. The police union drafted a memorandum, dated on October 21, 2022, on Plaintiff's behalf, which he reviewed for truthfulness and accuracy prior to authorizing the placement of his signature. (Ex. B, Pl. Dep Tr. 72:10-73:2; Ex. J.)

38. Plaintiff's memorandum admits that he is a probationary officer, is not entitled to a hearing, and hopes it will be reviewed in conjunction with the discharge recommendation. (Ex. J at 1; Ex. B, Pl. Dep. Tr. 73:3-18.)

39. The police union also submitted character reference memos, evaluations and awards. (Ex. B, Pl. Dep. Tr. 68:8-23; 69:13-15.)

40. On October 24, 2022, Plaintiff attended BOPFC meeting and was provided an opportunity to speak. (Ex. B, Pl. Dep. Tr. 78:1-7.)

41. Reed attended BOPFC meeting and spoke on Plaintiff's behalf. (Ex. K, Reed Dep. Tr. 7:8-11; 54:18-22; 55:8-12.)

42. BOPFC agreed with Chief Arres' recommendation. (Ex. A, Arres Dep Tr. 162:7-12.)

43. After BOPFC's meeting concluded, Arres notified Plaintiff of BOFPC's decision. (Ex. K, Reed Dep. Tr. 63:9-21.)

6

44. On October 24, 2022, Chief Arres sent an email to NPD staff stating BOPFC upheld Plaintiff's termination.  (Ex. B, Pl. Dep. Tr. 84:7-10; Ex. A, Arres Dep. Tr. 189:16-190:11.)

45. It's important to notify police staff of an employee's termination to prevent unauthorized access to NPD.  (Ex. B, Pl. Dep. Tr. 89:2-7.)

46. Chief Arres told police officers at various roll calls that Plaintiff had knowingly allowed Razionale, who was not present for the traffic stops, to take credit for traffic stops he wasn't there for; Chief Arres did this to clarify misinformation and rumors throughout NPD. (Ex. A, Arres Dep. Tr. 191:19-192:11.)

47. Chief Arres may have also said Plaintiff was untruthful, and this is an integrity issue. (Ex. A, Arres Dep. Tr. 194:1-3.)

48. Plaintiff is unaware of the chief of police's obligations regarding reporting requirements to the Illinois Law Enforcement Training Standards Board("ILETSB").  (Ex. B, Pl. Dep. Tr. 137:1-138:2.)

49. Following the conclusion of the investigation, Chief Arres filled out a professional conduct report and submitted it to ILETSB. (Ex. A, Arres Dep. Tr. 155:1-19; 156:15-157:10.)

50. Chief Arres received training from the state's attorney office about his obligation to report untruthful actions of police officers due to potential credibility concerns.  (Ex. A, Arres Dep. Tr. 95:1-10.)

51. Chief Arres contacted, via his department-issued phone, the DuPage County State's Attorney to inquire about his obligations to provide information regarding investigations involving police officers for untruthful behavior and provided the names of the officers under investigation, including Plaintiff.  (Ex. A, Arres Dep. Tr. 98:13-99:24; 100:10-16.)

7

52. Chief Arres contacted the Will County State's Attorney office to inquire about his obligations to provide information regarding investigations involving police officers for untruthful behavior but does not recall whether he ever spoke about Plaintiff. (Ex. A, Arres Dep. Tr. 104:4-9; 105:1-20.)

53. Chief Arres does not decide whether an officer is placed on the Brady list relating to untruthful behavior. (Ex. A, Arres Dep. Tr. 101:3-7.)

54. Non-probationary officers are subject to the grievance and arbitration process for disciplinary matters. (Ex. K, Reed Dep. Tr. 117:1-5.)

55. Police officers or the police union may file a grievance on behalf of an employee. (Ex. K, Reed Dep. Tr. 19:20-20:7.)

56. Plaintiff never filed a grievance relating to the extension of his probationary period or termination. (Ex. B, Pl. Dep Tr. 81:10-20; 83:1-9.)

57. Plaintiff met his traffic stop expectations, never received any discipline for failing to meet expectations, nor did he complain to any of his supervisors, governmental agency or oversight board about the policy. (Ex. B, Pl. Dep. Tr. 18:23-19:5; 19:18-20:1; 20:12-15.)

58. Plaintiff testified he did not submit anything in writing about the traffic stop expectation policy until October 21, 2022, when the FOP submitted a letter about positive community interactions pertaining to the Chicago Police Department consent decree as an exhibit in the BOPFC submission; the memo only says the policy was "source of much discussion and concern among officers and supervisors." (Ex. B, Pl. Dep. Tr. 20:2-7; Ex. J.)

                Respectfully Submitted,

                By:    s/ Jennifer Bonner
                          Jennifer Bonner
                          Senior Assistant City Attorney

City of Naperville
400 South Eagle Street

Naperville, Illinois 60540
Phone: (630) 420-4170
BonnerJ@naperville.il.us

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the aforementioned document was filed through the Court's CM/ECF system on October 4, 2024. Parties of record may obtain a copy through the Court's CM/ECF system. The undersigned certifies that no party of record requires service of documents through any means other than the CM/ECF system.

                                      s/ Jennifer Bonner