UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLAYTON PLUMTREE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 22 C 06635 |
| | ) |
| JASON ARRES, and the CITY OF NAPERVILLE, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clayton Plumtree was fired from his position as an officer with the Naperville, Illinois police department ("NPD") in October 2022. In this suit, Plumtree claims that the process afforded him to challenge that termination did not meet the constitutional minimum guaranteed to public employees by the Fourteenth Amendment.[1] Plumtree seeks relief against Defendants—Jason Arres, NPD's Chief of Police, and the City of Naperville ("the City")—under 28 U.S.C. § 1983. Defendants have moved for summary judgment [73] and, for the reasons explained below, the motion is granted.

## BACKGROUND

The court recites below the facts of this case, taken in the light most favorable to Plumtree, the party opposing summary judgment. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

### I. Plumtree's Termination

Plumtree was hired as an NPD police officer on April 19, 2021. (Pl. Local Rule 56.1 Statement of Additional Material Facts (hereinafter "PSOF") [83] ¶ 2.) In accordance with a

---

[1] Plumtree had previously pursued claims for retaliatory discharge, defamation, and indemnification but voluntarily withdrew those claims in response to Defendants' motion for summary judgment. (*See* [89].)

collective bargaining agreement ("CBA") in place between NPD and the Illinois Fraternal Order of Police Labor Council/F.O.P Lodge #42 ("FOP"), Plumtree's employment began with a probationary period of 18 months, during which time Plumtree was an at-will employee. (*Id.* ¶ 1.)

During Plumtree's stint at NPD, the department maintained a policy requiring its patrol officers to conduct an average of two traffic stops for each day they were on patrol; compliance with this quota was tracked quarterly. (PSOF ¶ 3; Arres Dep., Ex. 2 to PSOF [84] at 14:13–15:1.) In 2023, that policy was rescinded, after the events relevant to this case occurred. (*Id.* ¶ 5.) In 2021 and 2022, however, officers who failed to meet the quota were subject to progressive discipline, including performance improvement plans, verbal counseling, and possible termination. (PSOF ¶ 4.) Plumtree himself was never disciplined on this basis because he consistently met the traffic stop quota—in fact, as explained below, he performed more than enough traffic stops necessary to meet the benchmarks. (*Id.* ¶ 1.)

Specifically, on at least twenty occasions between April 29 and August 25, 2022, Plumtree allowed a colleague who was not meeting the quota, Officer Kenneth Razionale, to take credit for traffic stops that Plumtree, and not Razionale, had conducted. (Defs. Local Rule 56.1 Statement of Undisputed Material Facts (hereinafter "DSOF") [72] ¶¶ 18, 20.) Plumtree believed that this practice was permissible because his supervisor, Sergeant Bret Heun, had stated at an officer "roll call" meeting in early 2022,[2] attended by both Plumtree and Razionale, that other officers could "take some of Officer Plumtree's stops" in order to meet the quota. (PSOF ¶¶ 10–11.) Heun confirmed at his deposition that he had made a statement to that effect. (Heun Dep., Ex. 5 to PSOF [84] at 27:17–28:2.) Why Heun believed the practice was appropriate at that time is not clear, but later, according to Heun, one of Heun's own superiors, Commander Elena Deuchler of

---

[2] In Plumtree's recollection, this meeting took place in either late March or early April 2022. (Plumtree Dep. [72-2] at 33:24–24:20.) Heun testified that he could not remember precisely when the meeting took place but guessed that it took place sometime in April 2022. (Heun Dep., Ex. 5 to PSOF [84] at 27:17–28:7.)

NPD, characterized the practice of sharing another officer's traffic stops as in a "gray area" but "okay . . . as long as everyone made their traffic stop numbers." Commander Deuchler made that statement on August 16, 2022, after Plumtree had told Heun that Razionale had taken credit for some of Plumtree's traffic stops.[3] (PSOF ¶ 12; Heun Dep. at 19:7–20:1.)

In fact, however, the practice of "shared" traffic stops was not approved. On September 2, 2022, Plumtree was placed on administrative leave and received a notice from NPD that he was being investigated for alleged violations of several NPD policies, stemming from his sharing of stops with Razionale.[4] (DSOF ¶ 21; Plumtree Dep. [72-2] at 40:2–42:6.) Plumtree signed and dated the notice. (Plumtree Dep. at 41:17–42:6.) As part of the investigation, Plumtree was interrogated on September 14, 2022 by NPD Commander Michaus Williams. (DSOF ¶ 22.) As he began his questioning of Plumtree, Commander Williams first confirmed that Plumtree was familiar with the allegations levied against him. (Plumtree Interrogation [72-4] at 3:16–21.) Williams went on to explain that the allegations that Plumtree and Razionale had "collaborated on stops" where Razionale was not present were "backed up by video, AVL, [and] MDC traffic" between the two officers. (*Id.* at 4:11–16.) An MDC (short for "mobile data computer") is a device used by NPD officers to communicate with colleagues and to "run license plates and driver's licenses" (DSOF ¶ 17); the parties do not define AVL, but the court understands that it stands for "automatic vehicle locating," which refers to a GPS system used to trace officers' vehicle location. *See AVL/GPS for Front Line Policing*, U.S. DEP'T OF JUST., OFF. OF JUST. PROG., https://www.ojp.gov/ncjrs/virtual-library/abstracts/avlgps-front-line-policing (last visited July 1,

---

[3] Defendants object to Heun's testimony regarding Deuchler's statements as inadmissible hearsay and note that Deuchler denies having made these statements. (Def. Resp. to PSOF [87] ¶ 12.) The objection is overruled: Deuchler's statement was made (at least according to Heun) in her capacity as an employee of the City of Naperville, thus qualifying as a non-hearsay statement of an opposing party under Federal Rule of Evidence 801(d)(2)(D).

[4] The policies cited in the notice are NPD General Order 26.4.2(C) Attention to Duty — Conduct and Behavior; NPD General Order 26.4.2(O) Attention to Duty — Department Reports; and NPD General Order 26.4.2(F) Attention to Duty — Truthfulness. (DSOF [72] ¶ 21; Notice of Allegations and Investigation, Exhibit E to DSOF [72-5].)

2025). In response to Commander Williams' questions, Plumtree admitted to entering inaccurate information concerning traffic stops into NPD records, though Plumtree maintained that the practice was common and condoned. (DSOF ¶¶ 22, 24; Pl. Resp. to DSOF [85] ¶¶ 22, 24.)

On October 14, 2022, Plumtree met with Defendant Arres, NPD's Chief of Police; Plumtree was accompanied at the meeting by multiple representatives from the FOP, including Lodge President John Reed, as well as an attorney. (DSOF ¶¶ 25–26.) At this meeting, Arres told Plumtree that the allegations that Plumtree had violated NPD policy had been sustained, and that Plumtree was being terminated. (*Id.* ¶ 27.) It is undisputed that at the time of this meeting Plumtree was still a probationary employee. (*See* PSOF ¶ 2 (stating Plumtree's position that his probationary period would have expired on October 18, 2022, based on a start date of April 19, 2021).) The parties dispute, however, whether under the governing CBA, Arres had the authority to unilaterally terminate a probationary employee such as Plumtree, or whether Arres' role in such terminations was limited to making a recommendation of termination to the City's Board of Fire and Police Commissioners ("BOFPC"). (*See* Def. Resp. to PSOF [87] ¶ 16.)

On October 19, 2022, the City rescinded Plumtree's termination, at least in part in response to a request from the FOP asking for the BOFPC to provide input on Plumtree's firing.[5] (DSOF ¶ 30.) On that date, Arres extended Plumtree's probationary period for 30 days for "disciplinary purposes"; whether Arres could properly extend Plumtree's probationary period under the CBA is also disputed. (DSOF ¶¶ 30, 32; Def. Resp. to PSOF ¶ 30.)

On October 21, 2022, Arres submitted a memorandum to the BOFPC recommending Plumtree's termination. (DSOF ¶ 35.) Plumtree testified that he received a copy of Arres' memorandum, though he is uncertain of the precise date. (*Id.* ¶ 36.) The FOP drafted its own memorandum opposing Plumtree's termination, which Plumtree reviewed and signed before the

---

[5] It is unclear from the record which decisionmakers within the City determined to rescind Plumtree's termination; the rescission was communicated by an attorney for the City. (*See* Rescission Email [72-6].; [84] at 373.)

FOP submitted it to the BOFPC, also on October 21. (*Id.* ¶ 37; PSOF ¶ 30.) In that memorandum, the FOP acknowledged that Plumtree was a probationary employee (DSOF ¶ 38), but Plumtree disputes that he continued in probationary status on that date. (Pl. Resp. to DSOF ¶ 38.)

On October 24, 2022, Plumtree attended a BOFPC meeting where both he and Reed, the FOP president, had an opportunity to speak on Plumtree's behalf regarding the charges against him. (DSOF ¶¶ 40–41.) The BOFPC also held on October 24 a "closed session" at which Arres and an NPD investigator spoke without Plumtree present. (PSOF ¶ 31.) Ultimately, the BOFPC approved Plumtree's termination on that same date. (DSOF ¶ 42.) Later that day, Arres notified Plumtree and Reed of the BOFPC's decision.[6] (*Id.*) Reed testified that Arres "explained the decision" to him and Plumtree at that time but did not offer details as to the explanation provided. (*See* Reed Dep. [72-11] at 62:24–63:12.)

## II. CBA Grievance Procedures

The Collective Bargaining Agreement between the FOP and NPD creates a grievance and arbitration procedure by which officers may challenge disciplinary actions. (*See* CBA Excerpts [72-2] at 4–8.) Probationary officers, however, are not entitled to this process for challenging discipline. (DSOF ¶ 55; Pl. Summ. J. Supplement [93] (hereinafter "Pl. Supp.") at 2.) As the court understands the record, the existence of a grievance procedure, and whether it was available to Plumtree, are critical to Plumtree's procedural due process claim. The court thus briefly summarizes the grievance process below.

Challenges to discipline via grievance proceed in three steps. First, either the grievant officer or the FOP must submit the challenge in writing to the NPD Chief of Police. (CBA Excerpts at 5–6.) The Chief or a designee must then investigate the grievance and offer to meet with the

---

[6] Plumtree now asserts that the BOFPC never served him with "formal charges, findings, or written notice," and that the BOFPC "did not publicly vote" to terminate him. (PSOF ¶ 31.) As Defendants note, however, the only evidence Plumtree cites for those assertions is a segment of John Reed's deposition testimony that does not support the propositions. (Def. Resp. to PSOF ¶ 31; Reed Dep., Ex. 4 to PSOF [84] at 54:18–56:16.)

grievant and an authorized FOP representative. (*Id.* at 6.) Once the Chief has reached a decision, or the parties have agreed to a resolution, the Chief will issue a written summary of the decision or resolution. (*Id.*) If the grievant wishes to appeal from the Chief's decision, then within seven days of receipt of that decision, the FOP submits an appeal in writing to the Naperville City Manager. (*Id.*) The City Manager or a designee will then meet with the grievant officer and an FOP representative to discuss a resolution. (*Id.*) If that discussion does not result in a settlement, the City Manager or designee submits a written decision to the FOP. (*Id.*) An appeal from that decision is also available, by way of arbitration. (*Id.* at 7.) At arbitration, both the City and FOP may request that the arbitrator require the presentation of witnesses and documents, and both sides may retain legal counsel. (*Id.*) The arbitrator determines whether the officer's discipline resulted from a violation, misinterpretation, or misapplication of the CBA; the arbitrator's decision is final and binding upon the City, the FOP, and any employee covered by the CBA. (*Id.*)

In this case, it is undisputed that Plumtree did not challenge his termination via the grievance process outlined above, either after Arres initially fired Plumtree on October 14, 2022, or after the BOFPC decided to approve Plumtree's termination on October 24, 2022. (DSOF ¶ 56.) Plumtree testified at his deposition that he did not file a grievance after Arres initially fired him because he was told by an FOP representative—whether this was Lodge president Reed or someone else is unclear—that Plumtree "was probationary status" and thus "could not file a grievance." (Plumtree Dep. at 81:10–16.) Plumtree further testified that, after the initial termination, he could not recall speaking with anyone at the FOP about filing a grievance and could only remember speaking with Reed "about other avenues." (*Id.* at 81:21–82:7, 83:1–9.)

## **DISCUSSION**

Summary judgment is appropriate where there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). That is the case here with respect to both Plumtree's procedural due process and *Monell* claims.

I.   **Procedural Due Process**

The questions presented by a procedural due process claim are "(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?" *Bradley v. Vill. of Univ. Park, Illinois*, 929 F.3d 875, 882 (7th Cir. 2019) (citations omitted).  The parties contest whether Plumtree had a property interest in his continued employment at NPD, such that the procedural due process protections of the Constitution were implicated by his termination.  (*See* Mem. [74] at 5–7; Opp. [86] at 5–6, 8).  That dispute boils down to whether Plumtree could properly be classified as a probationary employee at the time his termination was approved by the BOFPC.  As this court explained in an earlier ruling denying Defendants' motion to dismiss Plumtree's claim, that question is a complicated one.  (*See* Mem. Op. and Order [34] at 7-9.)  Ultimately, however, the court concludes it need not reach the issue.  Even assuming that Plumtree did have a property interest in his job, the record shows that he received and/or had available to him all the process that was due.

As the parties recognize, under *Cleveland Bd. of Educ. v. Loudermill* and its progeny, a public employee who has the requisite property interest in his job is entitled to a certain amount of pretermination due process, namely (1) oral or written notice of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity to present his side of the story. 470 U.S. 532, 546 (1985); *accord Gilbert v. Homar*, 520 U.S. 924, 929 (1997).  The *Loudermill* Court explained that the employee's opportunity to be heard must include "some form of pretermination hearing," 470 U.S. at 542, but that the hearing need not be "elaborate" or approximate a "full evidentiary hearing." *Id.* at 545.  Instead, a pretermination hearing functions as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46. Critically, however, the holding and reasoning of *Loudermill* in this regard rested, in part, on the availability of post-termination administrative procedures provided by state law, and the Court cautioned more generally that "the existence of post-

7

termination procedures is relevant to the necessary scope of pretermination procedures." *Id.* at 546–47 & n.12.

The court analyzes below the sufficiency and availability of the pre- and post-termination procedures relevant to Plumtree's case.

### A. Pretermination process

Plumtree does not dispute that he had notice of his proposed termination. But he argues that he was deprived of proper notice of the allegations against him—that is, the proposed reasons for his termination—because Defendants "failed to file formal written charges" against him "as required by Illinois law." (Opp. at 7 (citing 65 ILCS 5/10-2.1-17).) The court disagrees.

As Defendants note, it is well-established that failure to comport with state-created procedure does not, in and of itself, establish a constitutional due process violation. (Reply [3] at 3 (citing *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) and *Charleston v. Bd. of Trs. of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013)).) Without some evidence that NPD's claimed violation of Illinois law left Plumtree in the dark about the reason for his proposed termination, the violation is of no moment to the constitutional inquiry.

Such evidence is lacking in this record. It is undisputed that when NPD first launched its investigation of Plumtree, it sent him a notice of the allegations against him, which he signed and dated. Further, when Plumtree was interrogated by Commander Williams of NPD during that investigation, Plumtree confirmed that he understood the allegations against him, and Williams explained that those allegations were based on video evidence, automatic vehicle location data, and MDC communications between Plumtree and Razionale. Plumtree has otherwise failed to offer any basis—not even his own testimony—for a jury to conclude that Plumtree did not understand that the reason for his proposed termination was his allowing Razionale to take credit for his traffic stops.

That leaves the adequacy of Plumtree's opportunity to present his side of the story to the BOFPC. It is undisputed that Plumtree was able both to submit (via the FOP) a memorandum to

8

the BOFPC and to appear in person before the board to make his case. Plumtree does not contend that these media of communication did not allow him to communicate his side of the story. He nevertheless contends that his pretermination hearing on October 24, 2022 "was fundamentally defective" because Arres addressed the BOFPC in a closed session while excluding Plumtree, such that Plumtree was "barred from rebutting the Chief's ex parte statements," and thus, Plumtree argues, was denied the "opportunity to respond" that *Loudermill* guarantees. (Opp. at 7.)

Recall, however, that *Loudermill* does not require that pretermination proceedings approximate full evidentiary hearings, and that the "opportunity" that *Loudermill* guarantees the employee is to present *their* side of the story, not to confront every witness or rebut every statement or argument the employer presents in *its* side of the story. Tellingly, Plumtree fails to cite any case law to support the proposition that pretermination proceedings are rendered constitutionally defective because the public employer, or its agent, makes *ex parte* statements to the decisionmaker.

The pretermination process Plumtree received was constitutionally adequate, assuming Plumtree could avail himself of "a more comprehensive post-termination hearing." *Gilbert*, 520 U.S. at 929. The court turns next to the question of what post-termination process was available to Plumtree.

### B. Post-termination process

Plumtree does not appear to contest that the post-termination grievance and arbitration procedure outlined in the CBA is constitutionally adequate. *See Calderone v. City of Chicago*, 979 F.3d 1156, 1166 (7th Cir. 2020) (explaining that "extensive grievance and arbitration procedures" created by CBAs "can (and typically do) satisfy the requirements of post-deprivation due process") (citation omitted). Plumtree's position, rather, is that this process was "categorically unavailable" to him. (Pl. Supp. at 1.) The court disagrees.

9

Plumtree first argues that the court should consider the grievance procedure unavailable because Defendants and the FOP "treated [him] as ineligible" for that process based on their understanding that he was a probationary employee. (*Id.* at 2.) But as Defendants point out, there is no evidence that anyone stopped Plumtree from filing a grievance challenging both his classification as a probationary employee and the merits of his termination. (*See* Defs. Summ. J. Supplement (hereinafter "Defs. Supp.") at 3.) Arres and the City take the position that Plumtree was a probationary employee, and thus not entitled to file a grievance. But this does not mean that Ares or the City denied Plumtree of the chance to challenge the probationary determination itself via the grievance process.[7] The case might be different if Plumtree had tried to file a grievance and Arres had refused to even consider the argument that Plumtree was *not* probationary, or otherwise somehow prevented the FOP from appealing on Plumtree's behalf to the City Manager and, if necessary, in full-blown arbitration proceedings. But Plumtree himself testified that the reason he never filed a grievance was that, at the time, he accepted the FOP's view that he *was* a probationary employee even after he was reinstated, and thus was not entitled to pursue that avenue of relief.[8]

---

[7] Similarly, and contrary to Plumtree's contention (*see* Pl. Supp. at 4–5), the fact that Defendants have maintained their position as to Plumtree's probationary status during this litigation does not preclude them from arguing that, if Plumtree wanted to challenge the probationary determination as well as the merits of his termination, he could have done so through the grievance process.

[8] Plumtree is correct to note that plaintiffs are not required to exhaust administrative remedies before bringing claims under § 1983. (*See* Pl. Supp. [93] at 3–4.) But administrative exhaustion is not at issue here. An administrative exhaustion requirement would bar the court from considering the merits of Plumtree's challenge before Plumtree pursued such remedies. Here, the court is squarely considering the merits of Plumtree's claim under § 1983 at summary judgment. In this context, (1) because Plumtree brings a procedural due process claim, the question of what administrative process was available to him is embedded in the merits determination, and (2) the fact that Plumtree did not seek post-termination due process via the means created by the City all but dooms his contention that the City made that process unavailable to him. *See Hudson v. City of Chicago*, 374 F.3d 554, 563 (7th Cir. 2004) ("[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them") (citation omitted).

The court takes no position as to whether the FOP was right or wrong about Plumtree's probationary status. But even assuming the FOP was wrong and gave Plumtree inaccurate advice, the FOP's mistake could not establish liability against Defendants for depriving Plumtree of post-termination due process. The Seventh Circuit's decision in *Hudson v. City of Chicago*, 374 F.3d 554, 564 (7th Cir. 2004), controls this question.

In *Hudson*, the plaintiffs were two former Chicago police officers who, like Plumtree, challenged their termination on procedural due process grounds under § 1983. *Id.* at 556. The plaintiffs contended that a CBA-created grievance and arbitration procedure did not satisfy their post-termination due process guarantees because the CBA required the union to initiate the grievance on the officers' behalf, and the union had refused to do so. *Id.* at 563–64. The *Hudson* panel affirmed summary judgment in favor of the City, explaining that, even if these propositions were true, "the City should not be blamed for the mistakes of the [u]nion," and that the plaintiffs' recourse, if the union was indeed to blame, was to "sue[] the [u]nion for breach of its duty to fairly represent their interests." *Id.* at 564. In this case, there is no evidence that Plumtree pressed the FOP about contesting his classification as a probationary employee, along with the merits of his termination, via the grievance process. And if he had done so, and the FOP had refused, Plumtree's recourse would be against the FOP, and not Arres or the City.

Plumtree also argues that the grievance procedure was unavailable to him because (1) the CBA requires that grievances be filed within seven days of the adverse action, and (2) while he knew he had been fired on the date of the BOFPC's decision, October 24, 2022, he lacked "any explanation of the Board's basis for termination" until he received a written copy of the BOFPC's findings on or about November 17, 2022. (Pl. Supp. at 2–3.) Thus, Plumtree argues, he "had no meaningful ability to articulate or substantiate a grievance" within the CBA's deadline. (*Id.*)

As the court noted above, no evidence, not even Plumtree's testimony, supports the notion that he did not understand why he had been terminated. The evidence that he did understand,

11

or should have, is overwhelming: he received and signed the notice of the charges against him; he confirmed during his interrogation that he understood the charges against him; he reviewed and signed the memorandum the FOP submitted to the BOFPC on his behalf; and he made his own case to the BOFPC in person. Plumtree's argument on this count remains meritless.

Even assuming Plumtree was a non-probationary employee with a property interest in his job at the time the BOFPC approved his termination, he did not suffer a due process violation. The pretermination process he received satisfied the guarantees of *Loudermill*. There is no dispute that the CBA's post-termination grievance procedure was adequate for due process purposes, and that process was available to Plumtree, even if he believed at the time he could not pursue it. His due process claim under § 1983 is dismissed.

## II.     *Monell*

Plumtree's *Monell* claim requires only brief discussion. Had he suffered a constitutional injury, Plumtree could hold the City liable only if he could establish that the injury was the result of a municipal policy, meaning that municipal action was the "moving force" behind that injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020). Because he has not identified a genuine dispute on his claim of a due process violation, the court need not address the City's liability under the *Monell* doctrine.

In any event, Plumtree's *Monell* argument appears to rest on his claim that the City took action against him because he opposed the traffic stop quota policy, a policy that he now believes violates the Constitution and an Illinois statute, 65 ILCS 5/11-1-12. (*See* Opp. [86] at 12–15.) Plumtree withdrew his claim of retaliatory discharge, however (*id.* at 1), and the materials he cites (relating to his appeal from the termination decision) do not support the notion that it was his opposition to the policy that motivated the termination decision.[9] Nor does anything in support

---

[9] Plumtree cites his appeal submissions, including, in particular, Exhibit G in support of that appeal; but Exhibit G is a letter from Attorney General Raoul, disapproving a City of Chicago policy setting a quota for police officers' "Positive Community Interactions" with members of the public. (*See* Plumtree Appeal, Ex. 8 to PSOF [84] at 344–352.) It does not directly address

of the appeal undermine the court's conclusion that he received all of the due process protections to which he was entitled.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment [73] is granted.

ENTER:

Dated: August 29, 2025

REBECCA R. PALLMEYER
United States District Judge

---

Naperville's traffic stop quota policy. The materials in support of Plumtree's appeal include numerous character references from fellow officers. Among those materials, the court located only one communication from Plumtree himself: a memorandum dated October 21, 2022, which post-dated the initial termination decision and thus could not have motivated that decision. Plumtree asserted in that memorandum that he had not made false statements in any police report. He also acknowledged in that memorandum that his actions (presumably, allowing another officer to take credit for his traffic stops) was "wrong," but did not directly challenge the quota policy itself. (*Id.* at 238–241.)

13